## Case No. 13,186.

### SOUTHERN BANK v. The ALEXANDER McNEIL.

[20 Int. Rev. Rec. 176.]

Circuit Court, S. D. Georgia. Nov. 25, 1874.

MARITIME LIENS—LOANS TO MASTER FOR "DISBURSEMENTS"—WAIVER OF LIENS.

[1. Where money was loaned to the master in a foreign port after investigation which showed the need of it to pay expenses necessary to enable the vessel to leave port, and upon the master's representation that he needed the money for "disbursements," *held*, that the lender was entitled to a lien, though he did not ask the master what particular payments he intended to make, and though the master in fact applied part of the money to satisfy claims which constituted no lien.]

[2. A loan of money to the master in a foreign port to pay overdue seamen's wages results in a maritime lien, whether seamen's wages may or may not be included within the terms "repairs" or "supplies."]

[3. A maritime lien is not lost by suing out an attachment in a state court, and causing the same to be levied on the vessel, where the sheriff does not maintain possession, and the action in the state court is voluntarily discontinued before filing the libel in admiralty.]

[4. A maritime lien is not waived by taking drafts on the owner, where the credit of the vessel was expressly relied on, and libellant offers to surrender the drafts at the trial.]

In equity.

Mr. Mercer, for libellant.

Messrs. Jackson, Lawton and Basinger, for intervenors.

ERSKINE, District Judge. This is a suit in rem, instituted by the Southern Bank of the State of Georgia against the bark Alexander McNeil and all persons intervening, for advances made, in the city of Savannah, to G. W. Leach, master of said bark, to pay off existing encumbrances and liens upon her to enable her to procure supplies; the master alleging that he was without funds, or other available means to procure them; and upon these representations, and at the request of the master, the libellants, on the 27th of March, 1874, advanced to him, on the credit of the bark, as well as of the owner and the master, $3,000; said bark being a foreign vessel, and then lying in the port of Savannah. And that on the 16th of May, 1874, the bark still continuing at said port and receiving cargo, the master represented to the libellant that further advances of money would be actually necessary to enable him to procure supplies for the bark, and to discharge and pay off certain encumbrances and liens, to enable her to get ready and proceed to sea; and in pursuance of such representation and request, and after investigation, the libellants did furnish to the master the further sum of $2,176—making, in the aggregate, $5,176—on the credit of the bark, as well as the owner and master thereof, for the purposes set forth. And that the advances were suitable, and necessary and proper to accomplish the objects for which they were alleged and declared to have been, and that the said sums of money are unpaid.

Petition was filed by Thompson and Walter, libellants, and proceedings were had therein; and the bark was sold by order of this court, and the proceeds—$10,500 less the marshal's costs—brought into the registry, on the 10th of August. After this libel was filed, but before the sale of the bark, F. Schuchardt and Sons, of New York, filed in this court their claim, intervening for their own interest, to the libel of the Southern Bank of the State of Georgia against the bark Alexander McNeil, alleging that Kate Jaquenot, of the city of New York, then owner of the bark, did, on the 16th of April, 1870, at said city, being then indebted to intervenors $30,000 for money lent and advanced by them to her, on the bark, her tackle, etc., and to secure them made a mortgage of said bark to them, with power, in case the mortgage money or any part of it, should remain unpaid after one year from the said date, to take possession of and sell the bark, at public auction, without any proceedings in court, or otherwise, said Kate covenanting to make bill of sale to perfect title, and which mortgage was duly recorded on the 16th of April, 1870, in the office of the collector of customs, at the

port of New York, where the bark was registered; that the Southern Bank of the State of Georgia, the libellant, "does not show any sort of lien on the bark, nor has it in fact any lien;" that a sale of the bark has been ordered in another cause now pending, and they pray that the proceeds of such sale may be adjudged to them exclusive of said bank. The intervenors also insist that the libellants instituted certain proceeding, in a state court, by attachment, against the owner of the bark, and caused her to be levied upon. And although the sheriff did not maintain his possession, nevertheless, the attempt being made, it must be taken as conclusive evidence that the bank either did not consider it had a lien, or abandoned it for what it considered the better remedy.

The evidence of Mr. McMahon, the acting president of the bank, Mr. Graybill, the consignee of the bark, and Leach, the master, shows that the master, accompanied by the consignee on the 27th of March last, called at the office of the bank, the libellant, and told McMahon that he wanted some money. Being asked what sum, he replied, "About $3,000," stating that the bark had been out from home for two years, and during that time the crew had not been paid, and that he wanted the money to pay them and the other necessary expenses of the vessel. McMahon told him to draw his draft either on the charterer or the owner, specifying that it was for "disbursements," and have it endorsed by the consignee; that it must be drawn in that way, as Mr. Graybill's credit was not good. The latter concurred in the statement made by the master, adding that the money was necessary for the vessel. McMahon further testified that the money was lent upon the credit of the vessel. Afterwards, on the 16th of May, $2,176 was advanced upon the master's representations, that this additional sum was necessary for the vessel's expenses, of same character as the first, and, as in the former case, a draft was given for this sum. Graybill, the consignee, was present at the time, and confirmed the statements of the master. The whole amount loaned was $5,176. McMahon also swore that the money was paid to the master himself, and solely on the credit of the vessel; that none of it had been repaid, and that the libellant is ready to surrender the drafts for cancellation and does not look to them for payment; the drafts were indorsed by Graybill, the consignee; one was transmitted, and returned protested. Further, that the master told him he had no other means of getting the money, and had been compelled to borrow some from the officers of the bark to get to this port; that he had tried to communicate with the owner, but could get no reply. McMahon also testified that he did not know, until after suit, how the money had been applied; regarded bills of ships as best security, because "we look to the ship." Upon cross-examination by proctor for intervenors, he said the master gave him no statement of the particular amount he expected to pay; did not ask him that question; asked him, generally, what he wanted with the money, and he said for ship's disbursements. The testimony of the consignee corroborated, and was to the same effect as McMahon's. Inter alia, Graybill said that he had previously endeavored to borrow the money himself for the bark from the libellant, but could not effect a loan; that the bank lent the money in good faith and upon the credit of the vessel. Nor is there any real discrepancy between the evidence of McMahon and the master in regard to the manner of obtaining the money, and the representations he made to procure the loans. Answering an interrogatory, he says: "I borrowed $5,176 in currency, from the Southern Bank of the State of Georgia, representing to the bank, at the time I got it, that it was necessary for the vessel's disbursements and to pay the crew off, the wages having accumulated during this long voyage. By 'disbursements,' I mean such outlays as were necessary to enable the ship to get ready and proceed on her voyage from this port." Elsewhere, he says: "The money was advanced upon the faith of the vessel to pay her bills;" and he further states that he made efforts to get the money from the owner, as it was his purpose to pay it before the vessel sailed. The consignee also testified that the bark could not have gone off without paying her bills, for which purpose this money was borrowed from the bank. He further said, that the master had no means of getting money here, save in the way he did; he had none for him, nor could he get him any; that the master had tried to communicate with the owner, who, according to the ship's papers, was a woman, and who, it was said, was in Switzerland.

Before passing to the principal question, I deem it proper to notice the response of the master to a question or two propounded by the proctor for the mortgagees as to what disposition he made of the $5,176. His reply was, that he paid $1,600 to the old crew; $341 to the old crew remaining by the vessel; $75 for shifting berth; $1,492 to his own wages; $300 to Coyne, the stevedore; $40 for storing deck load; $473 for consignees' commissions; $173 for hotel expenses; $62 for expenses to and returning from New York to consult mortgagees; $15 for telegram, attempting to communicate with owner and charterer; $262 for custom house; $14 for harbor fees; $40 carpenter and cooper; $15 telegram to charterer; $90 discharging ballast; $28 for custom house and hospital fees; $74 for telegrams to mortgagees, charterer, and owner; $10 for meat, and $27.48 still due by consignees. Pausing to look over these items, it will be discovered that he applied about $2,500 to pay claims strictly maritime or privileged.

The other demands paid, — stevedore's account, commissions to consignees, his own wages and board, etc.,—were not maritime liens. This morning I have rendered decrees in favor of several libellants, for seamen's wages and expenses of board, pilotage, supplies, etc., amounting in all to over eighteen hundred dollars, to be paid from the proceeds of the bark in the registry. The greater portion of these privileged debts was either due or current when the master received the money from the libellants. If the master had discharged these liens in addition to those of the same rank he did pay, it would have shown a proper expenditure of over $4,300 of the money advanced by the libellants.

Assuming, for the present, as a fact established, that the loan was lawfully made to supply wants of necessities of the vessel, and upon her credit alone, then the presumed hypothecation must be upheld and the maritime lien—which is a kind of proprietary interest in the thing—asserted against the vessel, or, necessarily in this particular case, by reason of her sale, against the fund in the registry. And, as the lender upon hypothecation must not only act throughout in good faith, but must also use reasonable precautions to satisfy himself that the hypothecation is necessary, and having done so, if, after the advancement of the money to the master himself, he squanders it, or applies it to purposes for which loans of this description cannot lawfully be made, the rights of the lender are not thereby imperilled or affected; for, in such case, he is not responsible for any abuse or misappropriation of the funds. What I have just said is sustained by Sir William Scott, in the case of The Jane, 1 Dod. 461. "The master," observed that eminent judge, "is a person selected by the owners themselves; they repose trust in him, and hold him out to others as trustworthy." This reasoning is not confined to persons employed in this capacity only, it is common in most situations of life; if a domestic servant employed by his master to purchase necessaries for the use of the house, misapplies goods obtained under that pretence, though the authority is abused, the master is still liable for his acts. The tradesman who supplied the goods is not to be a sufferer, unless it could be shown that there was collusion with the servant for the purpose of defrauding the master. It will be remembered that Mr. McMahon, the agent, and who, as acting president of the bank, the libellant, negotiated the loan or loans with the master, swore positively that he did not know until after suit how the money advanced and in the possession of the master had been applied. Therefore, resting upon the postulate with which this immediate subject began, it would follow that a decision should be for the libellant. The Fortitude [Case No. 4,953]; The Virgin, 8 Pet. [33 U. S.] 538. That sovereign necessity, good faith between man and man, is visible throughout this case, so far, at least, as the agent of the libellant and the consignee are concerned. And as to the master, so far as he acted pending the negotiation, the same commendation would seem to be applicable to him also; but his conduct afterwards, more especially in appropriating to himself for his wages and hotel bills, nearly seventeen hundred dollars, closely approaches the borderland of suspicion, if, indeed, it does not indicate ill faith; for, in his office of master, he must have known that he had no lien upon the vessel for his wages or board. The veracity of McMahon, the truth of the statements and representations of the master, to obtain the money, nor the evidence of the consignee of the bark, independent, or confirmatory of, the other two witnesses, has not been questioned by the intervenors, or by any one else. That McMahon believed the loan created a maritime lien upon the vessel is beyond controversy. But, notwithstanding his belief, still the law requires that a lien or privilege be established by proof: by proof that the loan was necessary for the vessel—necessary, in the sense in which that word is used, to create an implied hypothecation; or the lender must have believed, upon due inquiry and credible representation, the loan to be necessary; and when proof is made of necessity for funds raised, by the master to pay for supplies, and of credit given to the ship, a presumption will arise, conclusive, in the absence of evidence to the contrary, of necessity for credit; or the ordering by the master of repairs or supplies upon the credit of the ship, is sufficient proof of such necessity to support an implied hypothecation in favor of the ordinary lender to meet the wants of the ship, who acts in good faith. See The Grapeshot, 9 Wall. [76 U. S.] 129, 141. It would be but mere pedantry and waste of time to attempt any enquiry into the origin of, and reasons given for, the nice distinctions which may be said to exist between implied hypothecation and hypothecation by bottomry; for it is only with the former kind of maritime liens or privileges I have to deal at present. So I may at once proceed to apply one or more of these clauses or (if not inaccurately speaking) propositions to the proofs before me. And if any one of these clauses or propositions is satisfied, there must be a decree for the libellant; otherwise not.

The testimony in this case is quite voluminous. I have given a pretty full and substantial recital of it in a former part of this opinion. I will now look to it in connection with the present question alone, directing the mind to the more extended statement just referred to. The master stated to McMahon, the consignee (who had seen the bark's papers) being present, and who concurred in the representations and statements of the master, that the bark had been out from home for two years, and that during that time the crew had not been paid, and he wanted about $3,000 to pay them and the other expenses of the vessel. At the time of the second advancement, the

master—the consignee also being there, and confirming his statements—represented that this further sum was necessary for the expenses of the bark, of the same character as the first. He said he had no other means of getting money; had borrowed some from his officers to get the vessel to this port; had tried to communicate with his owners and failed in his efforts. The consignee, in his evidence before the court, testified that he himself had endeavored to borrow money from the libellant for the bark, but had been unsuccessful; that the money was advanced, by the libellant upon the credit of the vessel, and in good faith; that the vessel could not have gone off without paying her bills, and for which purpose this money was borrowed; that the master had no other means of getting money, nor could he himself procure any. The master, in his depositions, said that at the time he borrowed the money he represented that it was necessary for the vessel's disbursements; that by disbursements he meant such outlays as were necessary to enable the bark to get ready and proceed on her voyage from this port, and that the money was advanced upon the faith of the vessel to pay her bills. McMahon, in replying to a question put to him by the intervenors, said that the master gave him no statement of the particular sum he intended to pay; did not ask him that question; asked him generally what he wanted with the money, and he said,· for ship's disbursements.

Argument or illustration is unnecessary, in applying the legal principles announced as governing the present question to the proofs adduced, to satisfy the common or legal mind that if there be a doubt (and I do not, after a careful perusal of the entire testimony, think there can be) that the evidence does not directly and conclusively prove there was a necessity for the money to provide for the maritime wants of the vessel, there can be none that it has been clearly established that McMahon, the agent for the libellant, believed upon due inquiry and credible representations the loan to be necessary. At each interview between McMahon and the master, Graybill, the consignee of the vessel, was present; heard all that passed; was acquainted with the wants of the vessel, and knew the contents of her papers; had previously endeavored to effect a loan for her from the libellant; and reasserted and corroborated the master's statements and representations. Had the consignee himself, under the facts and circumstances developed in this case, advanced the money on the credit of the vessel, he could, I apprehend, have lawfully accepted an implied hypothecation or a bottomry bond upon the bark. In The Hero, 2 Dod. 139, it was ruled that a consignee who had given credit for disbursements for the vessel, and who, finding that the disbursements amounted to more than he expected, could take a bottomry bond upon the vessel. See The Oriental, 3 W. Rob. Adm. 243, 2 Eng. Law & Eq. 546. Writers on maritime law generally speak of hypothecation in connection with repairs and supplies only. These are terms of large import; and, if taken in their strict literal and physical sense, it is probable that neither the word "repairs" nor "supplies" can be said to include "seaman's wages." Potentially, one or both may. But the subject is not worth a philological pursuit. As money may be advanced upon the credit of a vessel to make repairs, purchase supplies, or pay pilotage, why cannot she be pledged for money loaned to pay seaman's wages? Are seamen not as essential to the vessel as cables, anchors, provisions or pilots? Moreover, their lien for wages is the foremost privilege, and adheres to the last plank of the ship.

As to the question discussed concerning the attachment, on the 20th June last the bank (the libellant) sued out an attachment under the state Code against Kate Jaquenot, alleging that she owed the bank $5,176 and interest, and that she "resides out of the state." The writ commanded the sheriff "to attach and seize the property of Kate Jaquenot;" and on the 23d of June the bark was levied upon as her property; but the sheriff did not maintain his possession, and on the 11th of July the whole proceedings were voluntarily dismissed. This took place prior to the filing of the libel here. And the question is, whether the bank, by thus levying, waived its privilege upon the vessel. The proofs disclose the fact that when the master got the money from the bank he drew two bills or drafts for "disbursements." These were endorsed by Graybill, the consignee. One went forward and was returned protested, the other remained with the bank. The amount claimed as an account in the attachment is the same that the drafts call for. McMahon, in his evidence, said that the libellant did not look to the drafts for payment, and offered to surrender them. The general rule is that the drawing of a bill or draft or the giving of a promissory note does not amount to a waiver of the maritime lien or privilege and will be enforced against the vessel if the bill or note is surrendered at the trial. The Nester [Case No. 10,126]; Sutton v. The Albatross [Id. 13,645]; The Active [Id. 34.] See, also, The Guy, 9 Wall. [76 U. S.] 758. And whether there is a waiver is a fact for the court to settle on all the evidence. In the case of The Chusan [Case No. 2,717], it was held that such a bill or note, except in Massachusetts, was not prima facie a waiver of the lien upon the vessel, unless proved to have been so intended from all facts. And see The Emily Souder, 17 Wall. [84 U. S.] 666. There· is not any evidence before me, which tends, even in the remotest degree, to indicate a waiver. Indeed, on the contrary, the testimony is directly the opposite. The attachment alleged the debt to be due on account; but had the matter come to a trial the two drafts would, necessarily, have been the evidence to establish the account. But should it be said·

that it might have been a debt other than that represented by the drafts; if so, then it had no reference to the libellant's transactions with the bank. Pursuing this question any further would be quite unnecessary. See The Kalorama, 10 Wall. [77 U. S.] 204, where the court says: "Suggestion is also made that the lien was waived by the commencement of an action for the advances in the state court, but the record shows that the action is still pending. and it is well settled law that the pending of such an action is no bar to a suit in a federal court." See, also, Leon v. Galeeron, 11 Wall. [78 U. S.] 185, and Code, § 3203, and 46 Ga. 592.

There must be a decree for the libellants for $5,176, with interest thereon from the time of the filing of the libel to be paid to the libellant by the clerk out of the proceeds of the sale of the bark in the registry. The clerk will also tax the cost for the libellant. The mortgage upon the bark for $30,000. held by F. Schuchardt and Sons, who, as often observed, intervened here and claimed the proceeds in the registry, was denied to be valid by Mr. Mercer, for the Southern Bank of the State of Georgia, and by Mr. Guerard for other libellants; while Jackson, Lawton and Basinger, for intervenors, insisted that it was valid and subsisting mortgage. I have given the question careful consideration, and I am of the opinion that the instrument is a good and valid mortgage, and entitled to the surplus remaining in the registry, after the payment of all the costs arising out of the subject-matter of the several libels filed, and after all claims superior in dignity to the mortgage, shall have been paid and discharged.